The REGENTS OF the UNIVERSITY
OF MINNESOTA, Respondent,

v.

MEDICAL INCORPORATED, Appellant.

No. C7–85–418.

Court of Appeals of Minnesota.

Feb. 11, 1986.

Review Denied April 18, 1986.

Thomas W. Tinkham, I. Fay Nosow, Dorsey & Whitney, Minneapolis, for respondent.

Harold D. Field, Jr., Nancy C. Dreher, David L. Lillehaug, Leonard, Street and Deinard, Minneapolis, Charles A. Bassford, Jr., Baker & Bassford, P.A., Edina, for appellant.

Heard, considered and decided by FORSBERG, P.J., and LANSING and NIERENGARTEN, JJ.

## OPINION

LANSING, Judge.

The University of Minnesota brought this action for royalties and specific performance against Medical Incorporated, its licensee under a patent licensing agreement. The jury found the University was entitled to the royalties and also made findings from which the trial court granted specific performance. Medical claims the trial court committed a number of errors requiring either an amended judgment or a new trial. The University seeks review of the trial court's denial of its motion for attorney's fees and its denial of prejudgment interest for the period from October 1, 1984, through November 30, 1984. We affirm in part, reverse in part, and remand.

## FACTS

In 1966 Robert Kaster, a University employee, invented a heart valve. The University, as assignee of Kaster's invention,

applied for a patent on the valve in 1967. U.S. Patent No. 3,476,143 (the "Kaster patent") was issued to the University in November 1969.

In 1967 the University granted a license to manufacture heart valves to Washington Scientific Industries (WSI). WSI, with Kaster's assistance, developed the Lillehei-Kaster (L-K) heart valve, a clinically and commercially acceptable version of the Kaster patent. In 1971 WSI sold its heart valve business to Marshall Kriesel, who formed Medical Incorporated soon thereafter.

An agreement was negotiated between Medical and the University, licensing the right to make and sell heart valves in accordance with the Kaster patent. The license required a royalty for "each and every heart valve unit" made, calculated at five (5) percent of the retail sales price of the valve. The parties also agreed that the University would license any improvement inventions "covered by the claims" of the Kaster patent to Medical, and Medical would assign to the University any "improvements" to the Kaster patent it developed. The license was to be exclusive in the United States and Possessions for five years. Finally, the license required Medical to become a party to and pay all costs of a lawsuit which had been brought in 1970 by WSI and the University against Shiley Laboratories, Inc., for alleged infringement of the Kaster patent by one of Shiley's heart valves, the Bjork-Shiley valve. In return for its prosecution of the case, Medical's litigation costs were to be treated as prepaid royalties.

After a 13-day trial in 1974, the United States District Court for the Central District of California held that the Kaster patent was valid but not infringed by the Bjork-Shiley valve. *See Washington Scientific Industries, Inc. v. Shiley Laboratories, Inc.*, 187 U.S.P.Q. 236 (1975). The court's opinion implied that the Kaster patent did not accurately describe the L-K valve. *Id.* at 242. On the advice of their attorneys, the University and Medical chose not to appeal the decision. A settlement was reached with Shiley, and the decision became final.

Between July and November 1975, the University and Medical met several times to discuss the prepaid royalties Medical had accrued while funding the *Shiley* litigation. For the first time, Marshall Kriesel, the president of Medical, objected to paying royalties on the L-K valve, arguing that after the *Shiley* decision, it was questionable whether the Kaster patent covered the L-K valve. Kriesel was, however, willing to pay royalties on a new all-carbon valve Medical had under development, which he believed was covered by the "Child patent," which Medical had assigned to the University as an improvement patent under the licensing agreement.

The University took the position that the *Shiley* litigation had not decided whether the L-K valve was covered by the Kaster patent, but that in any event, Medical had agreed to pay a royalty on each and every valve it made.

An amendment to the license agreement was signed in November 1975. Under its terms, Medical agreed to resume payments of royalties under the license agreement on the L-K valve and on Medical's pending all-carbon heart valve. The University extended the exclusivity of the license on the all-carbon heart valve for an additional five years and extended the foreign exclusivity of the license until "the last of the licensed patents to expire." Further, the University waived royalties under the license for the period of August 1974 through October 1975 and paid Medical $100,000 as reimbursement for its costs in another lawsuit involving the Kaster patent.

Medical was to begin reporting royalties every six months beginning at the end of March 1976, with the first royalty payment due by March 31, 1977. No reports were ever submitted. The University asked Medical to make royalty reports and pay royalties. Medical's response was that the University would receive the reports when its audits were completed. In late 1980, after its patent experts had examined the *Shiley* decision and rendered opinions,

Medical informed the University that it would not pay royalties because it did not believe any of the valves it manufactured were covered by the Kaster patent. The University commenced this suit for royalties and for specific performance in November 1981.[1] A seven-week jury trial was held.

At trial the University advanced two arguments. It first asserted that the claims of the Kaster patent covered all heart valves manufactured by Medical (the L-K and the recently developed Omniscience (OS) and Omnicarbon (OC)) and that Medical's Huffstutler patent (which was a patent Medical had recently obtained on its OS valve) fell within the scope of the Kaster patent. The University argued alternatively that the scope of the Kaster patent was irrelevant because the license agreement required Medical to pay royalties on "each and every heart valve" even if the Kaster patent were found not to cover the L-K valve or the OS/OC valves. The University also claimed the Huffstutler patent had to be assigned to it as an improvement invention under the license. Medical's position at trial on the coverage issue was that after *Shiley*, the scope of the Kaster patent was narrow and could not be construed to cover either the L-K valve or the OS/OC valves. Therefore, Medical claimed, it was not obligated to pay any royalties under the license because it had only agreed to pay royalties on valves covered by the Kaster patent.

In special interrogatories, the jury found: (1) all three of Medical's current artificial heart valve products, the L-K, the OS, and the OC, are covered by the Kaster patent; (2) in the license agreement or the amendment Medical agreed to pay royalties whether or not the valves were covered by a patent; (3) the Huffstutler patent is an improvement invention under the grant-back clause in the license agreement; and (4) Medical owes the University $2,943,026 in past-due royalties and interest. Based on this verdict, the trial court ordered Medical to pay past royalties, to assign the Huffstutler patent to the University, and to continue to pay royalties on all its heart valves until December 22, 1997, the date the Huffstutler patent expires.

Medical appeals from the trial court's order denying its motion for a new trial, or alternatively for judgment notwithstanding the verdict, and from the judgment. The University filed a notice of review contesting the trial court's failure to award it attorney's fees and disputing the award of prejudgment interest.

### ISSUES

1. Did the trial court properly refuse to give the *Shiley* decision collateral estoppel effect?

2. Did the trial court err prejudicially in refusing to admit into evidence:

a. The *Shiley* decision?

b. The University's original complaint?

c. A letter written by one of the University's patent attorneys?

3. Does the jury's determination together with the trial court's construction of the license agreement and amendment constitute patent misuse by the University?

4. Did the trial court err in denying the University prejudgment interest for the period from October 1, 1984, through November 30, 1984?

5. Did the trial court abuse its discretion in failing to award the University attorney's fees?

### ANALYSIS

#### I

#### *Collateral Estoppel*

Medical contends the trial court erred in failing to give collateral estoppel effect to the *Shiley* decision and asserts the University is bound by the *Shiley* court's findings

---

1. Suit was brought in state court because litigation based on a license or royalty agreement seeking specific performance or damages for breach of contract does not "arise" under the patent laws; federal courts have no jurisdiction absent diversity of citizenship. 28 U.S.C. § 1338; *Wilson v. Sandford,* 10 How. 99, 51 U.S. 99, 13 L.Ed. 344 (1850).

and conclusions on the scope of the Kaster patent. Specifically, Medical asserts that *Shiley* found the Kaster patent valid but limited in scope to a valve with no backflow in the closed position and a fixed axis of rotation for the disc. Medical requested jury instructions based on this interpretation of *Shiley* and language from the opinion characterizing the Kaster patent as an improvement through details of construction, rather than a change in basic concepts in heart valve technology. The trial court refused Medical's requested jury instructions and refused to admit the *Shiley* decision on the issue of coverage, finding no identity of issues in the two cases.

▪ Collateral estoppel precludes the relitigation of issues which are both identical to those issues already litigated by the parties in a prior action and necessary and essential to the resulting judgment. *Ellis v. Minneapolis Commission on Civil Rights*, 319 N.W.2d 702, 704 (Minn.1982); *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 702 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984). Whether collateral estoppel is available is a mixed question of law and fact subject to de novo review; once it is determined that collateral estoppel is available, the decision to apply the doctrine is left to the trial court's discretion. *United States v. Geophysical Corp.*, 732 F.2d 693, 697 (9th Cir.1984).

▪ While more frequently applied to prior findings of patent invalidity, *see Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), preclusive effect may also be given to prior findings on the scope of a patent because determinations of infringement and validity both involve claim interpretation. *Overhead Door Corp. v. Whiting Roll-up Door Manufacturing Corp.*, 215 U.S.P.Q. 428, 433 (W.D.N.Y.1981) (citing *Iron Ore Co. of Canada v. Dow Chemical Co.*, 177 U.S. P.Q. 34, 59 (D.Utah 1972)).

The application of collateral estoppel turns on a determination of what was essentially decided in the *Shiley* litigation.

In finding the patent valid, the *Shiley* court compared the Bjork-Shiley valve with the claims of the Kaster patent in suit. The court identified in its findings four significant ways in which the claims of the Kaster patent failed to define the Bjork-Shiley valve: (1) the Bjork-Shiley valve did not have an "annular uninterrupted peripheral portion;" (2) the Bjork-Shiley valve did not block the reverse flow; (3) the Bjork-Shiley valve had a wobble or rocking open/close motion rather than a pivot; and (4) most significantly, the Bjork-Shiley valve did not have a first or second pair of legs and no elements corresponding to legs in structure or function.

In its conclusion the court stated:

I. The limitations in the broadest claims which were required by the Patent Office as a condition of obtaining a patent are binding upon plaintiffs and plaintiffs are not now free to claim any pivoting disc valve but only pivoting disc valves which include each of the components of the limitation introduced during prosecution; e.g., the two pairs of legs which are structured and which cooperate with the peripheral portion and with each other in the manner and relation defined in the claims * * *. Since the evidence clearly shows that the structure and the operating relationship of the support rods with the disc in the accused devices is different in principle from the legs and peripheral portion relationship defined in the limitations introduced into the claims to obtain allowance, *the only manner in which infringement could be found would be to ignore these limitations and this is not permitted.*

187 U.S.P.Q. at 243 (emphasis added). The limitations *Shiley* read into the claims of the Kaster patent that were essential to its judgment of non-infringement involved the relationship between the legs and the "annular uninterrupted peripheral portion" features. The court's findings on the two features on which Medical would base collateral estoppel—the backflow and fixed axis features—are not essential to the court's conclusion of law and judgment.

The doctrine of collateral estoppel is generally beneficial in patent claims because the litigation is lengthy, costly and complex. However, the burden of proof is on the party invoking the defense. *Virsen v. Rosso, Beutel, Johnson, Rosso & Ebersold*, 356 N.W.2d 333, 337 (Minn.Ct.App. 1984). Minnesota courts have traditionally required a strong showing that the requisites of the doctrine have been met:

> The defense of res judicata through estoppel by verdict [collateral estoppel] is to be allowed with caution, and it must rest upon a more solid basis than mere speculation as to what was actually adjudicated in the prior action.

> \* \* \* \* \* \*

> There can be no estoppel where there is a reasonable doubt as to whether a fact was actually adjudicated.

*Id.* (quoting *Wolfson v. Northern States Management Co.*, 221 Minn. 474, 479, 22 N.W.2d 545, 548 (1946)). Medical failed to show that the language from the *Shiley* opinion regarding the scope of the Kaster patent was necessary to the prior adjudication.

Medical also argues it is entitled to collateral estoppel because the valves it manufactures differ from the Kaster patent in the same way as the Bjork-Shiley valve. *See, e.g., Overhead Door*, 217 U.S. P.Q. at 433. The parties stipulated that Medical's valves have controlled peripheral backflow in the closed position and a shift in the axis of rotation upon opening and closing of the disc. However, Medical did not establish the identity of issues on the remaining two features which were necessary to the trial court's decision. Our examination of the record fails to persuade us that the trial court erred in refusing to apply collateral estoppel.[2]

## II

### *Evidentiary Rulings*

Evidentiary rulings on materiality, foundation, remoteness, relevancy, or the cumulative nature of evidence are committed to the sound discretion of the trial judge and will only be the basis for reversal where that discretion has been clearly abused. *Jenson v. Touche Ross & Co.*, 335 N.W.2d 720, 725 (Minn.1983). Moreover, "before an error in the exclusion of evidence may be grounds for a new trial, it must appear that such evidence might reasonably have changed the result of the trial if it had been admitted." *Id.* (citing *Poppenhagen v. Sornsin Construction Co.*, 300 Minn. 73, 79–80, 220 N.W.2d 281, 286 (1974)).

### a. Exclusion of *Shiley* Opinion

Medical contends the trial court erred when it ruled the *Shiley* opinion inadmissible on the coverage issue. If neither collateral estoppel nor res judicata applies, previous judgments are regarded as hearsay and are not within an exception to the hearsay rule. McCormick on Evidence § 318, at 894 n. 4 (E. Cleary 3d ed. 1984) (citing 5 Wigmore, Evidence § 1671a (Chadbourn rev. 1974)); *see also Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 505 F.Supp. 1125, 1184–86 (E.D.Pa. 1980) (judicial findings not admissible under public records exception), *aff'd in part, rev'd and remanded in part on other grounds sub nom. In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238, 275 (3d Cir.1983). The process for determining trustworthiness as required under rules 803 and 804 is unsuited to evaluating judicial opinions because rule 605 makes the judge incompetent as a witness. *Zenith Radio*, 505 F.Supp. at 1185.

In this case the trial court excluded the *Shiley* opinion because its slight relevance was outweighed by the danger of undue prejudice and jury confusion. *See* Minn.R.Evid. 403; *In re Commodore Hotel Fire & Explosion Cases*, 324 N.W.2d 245,

---

2. We also note that Medical and the University were co-plaintiffs in the *Shiley* case. Collateral estoppel is generally applied only to those issues actually litigated fully and fairly as adversaries. *See* Restatement (Second) of Judgments § 38 (1982). This issue was not raised or argued by the parties.

249 (Minn.1982); *Lines v. Ryan,* 272 N.W.2d 896, 902 (Minn.1978). The court reasoned that the jury would be likely to give undue weight to findings issued by a judge.

Medical asserts that it needed the decision to respond to the University's "strenuous attack" on the credibility of testimony by Medical's witnesses on contract negotiation. The University argued that Medical changed its position on the coverage of the Kaster patent because of the *Shiley* opinion, and Medical argues the jury should have had the opinion to evaluate Medical's explanations. The trial court permitted limited testimony on the outcome of *Shiley* "to accurately present the contract background from which the parties acted, and the views of some witnesses (right or wrong) of the meaning of *Shiley.*" We fail to see any prejudice to Medical.

Medical next contends the *Shiley* decision was relevant because it supported the opinions of Medical's experts that the Kaster patent had a narrow scope. James Brunton, Medical's independent expert, was not allowed to testify that the *Shiley* decision was "strong confirmation" of his own opinion on the scope of the Kaster patent. Brunton was, however, allowed to render an opinion independent of *Shiley* that Medical's valves are not covered by the Kaster patent.

■■■■ Rule 703 of the Rules of Evidence does not require that otherwise inadmissible evidence must be admitted as substantive evidence merely because it forms the basis of an expert's opinion. *See* P. Thompson, 11 Minnesota Practice: Evidence § 703.01, at 293 (1979). Even if *Shiley* were admissible for the limited purpose of explaining the expert's opinion, we cannot say that the trial court prejudicially erred in determining that the opinion's prejudicial and confusing nature outweighed its probative value.

■■■■ Medical also contends that the *Shiley* decision was necessary to cross-examine and impeach the University's expert witnesses, who testified that they had not read *Shiley* or considered it in reaching their conclusion that the Kaster patent had a broad scope. Medical argues that because its experts considered *Shiley* reliable, the University's experts could have been impeached on their failure to consider portions of the opinion. The trial court's evidentiary ruling allowing inquiry into whether they had read *Shiley* substantially satisfies Medical's desire to impeach the University's experts on this basis.

#### b. Exclusion of Original Complaint

■■■■ Medical contends that the trial court erred prejudicially in refusing to admit into evidence paragraph 5 of the University's original complaint, which states:

Defendant, in its Private Placement Memorandum dated February 21, 1981, asserted that it had sold approximately 70,000 units of the Lillehei-Kaster Valve, *the licensed product.*

(Emphasis added). The complaint was subsequently amended to read "*a* licensed product" (emphasis added). Medical asserts that the use of the singular "the" reflects a concession by the University that the L-K valve was the *only* licensed product, rather than one of several licensed valves. The trial court concluded that the complaint could not be regarded as either a factual admission or a prior inconsistent statement. We agree that this was not clearly an admission; even if it is an inconsistent statement, we fail to see how its exclusion prejudiced Medical.

#### c. Exclusion of the Letter

■■■■ Medical claims that the trial court erred in refusing to admit into evidence exhibit 207, a letter dated February 1969 from Richard Bartz, the patent attorney who prosecuted the Kaster patent application, to G. Willard Fornell, the University's Patent Administrator at the time. Exhibit 207 was the subject of considerable controversy during the *Shiley* trial. In the letter, Bartz explained a recent improvement to the L-K valve. He said the specific structure could not be claimed under the existing patent, but that it was broadly included in the amended claim and a new claim.

Medical argues that this letter is an admission that the University's own patent attorney believed that the Kaster patent was narrow in scope and that it did not cover valves with backflow.

Medical first attempted to introduce the letter during cross-examination of Fornell. The University's objection that the letter lacked foundation and was not relevant to this action was apparently sustained by the trial court, although the in-chambers discussion is not included in the record. Medical later attempted to introduce the letter to impeach Kaster. The University argues that the letter could not be properly admitted to impeach Kaster's testimony because Medical failed to lay the necessary foundation under Minn.R.Evid. 901; Kaster denied ever having received the letter, and Medical did not attempt to lay the proper foundation either through Bartz (whom Medical identified as a witness but did not call), or through Fornell.

Medical also argues the letter represents a party admission, requiring no foundation. At the time the exhibit was offered, Medical made no attempt to show it constituted a party admission. Even if this letter can be considered an admission on the part of the University, its exclusion did not prejudicially affect the outcome of the trial. Ample evidence at trial supported the jury's determination that Medical's valves were covered by the Kaster patent.

### III

### *Patent Misuse*

Medical claims that the license agreement between the parties constitutes patent misuse that renders the Kaster patent unenforceable. Medical bases its argument on three provisions of the license agreement: (1) the "total sales" provision; (2) the grant-back clause; and (3) the payment of royalties on heart valves beyond the expiration of the Kaster patent.

 Patent misuse is an affirmative defense, and the party asserting it has the burden of proof. *Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 615 (Fed.Cir.1984), *cert. denied,* ── U.S. ──, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984). The misuse issue was raised in the pleadings and argued at trial, but Medical did not request a special interrogatory on this issue. Minn.R.Civ.P. 49.01(1) provides that a party waives a right to a trial by jury if a factual issue is omitted from special interrogatories; the court may make a finding regarding the omitted issue or, if it fails to make a finding, will be presumed to have made a finding in accord with the judgment on the special verdict. *See* Herr & Haydock, 2 Minnesota Practice § 49.15, at 436 (1985). The trial court made no findings, so we must imply findings consistent with the verdict.

#### a. The Total Sales Provision

Paragraph three of the original license agreement provides that "Medical agrees to pay to Minnesota for each and every heart valve unit made and sold by Medical a production royalty equal to 5% of the retail sales price * * *." The 1975 amendment to the agreement provides that Medical would resume payment on both the L-K and "its pending all-carbon heart valve * * in accordance with the terms of the Agreement." The jury found that the license agreement and its amendment obligated Medical to pay royalties on both the L-K valve and the OS/OC valves regardless of whether they were covered by the Kaster patent.

 Conditioning the grant of a patent license upon payment of royalties on products that do not use the teaching of the patent constitutes patent misuse. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 135, 89 S.Ct. 1562, 1582, 23 L.Ed.2d 129 (1969). "Conditioning" consists of "a patentee's insistence on a percentage-of-sales royalty, regardless of use, and his rejection of licensee proposals to pay only for actual use." *Id.* at 139, 89 S.Ct. at 1585. Whether or not "conditioning" exists is a question of fact. *See Glen Manufacturing, Inc. v. Perfect Fit Industries, Inc.*, 420 F.2d 319 (2nd Cir.1970),

*cert. denied,* 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970).

■ In order to find conditioning under a "total sales" provision, a patent licensor must have (1) insisted upon or demanded the payment of royalties on merchandise which the licensor *clearly knew* did "not employ \* \* \* the discovery which the claims of the patent define," *Zenith,* 395 U.S. at 140, 89 S.Ct. at 1585, and (2) rejected "licensee proposals to pay only for actual use." *Id.* at 139, 89 S.Ct. at 1585; *see also Chandler v. Stern Dental Laboratory Co.,* 335 F.Supp. 580, 583 (S.D.Tex. 1971) (licensor sought royalties on products which, by its own admission, did not come within scope of patent; held to be misuse).

■ The jury found that the valves were covered by the Kaster patent, and Medical does not dispute the sufficiency of the evidence to support this finding. No patent misuse can exist when the total sales provision requires royalties only from covered products. Even before trial it is clear that neither party was entirely certain whether the Kaster patent covered the L–K valve. The record also indicates that, far from being "conditioned," this total sales provision was the result of considerable bargaining by the parties over a number of terms in the agreement.[3] Given this record, we conclude that the trial court did not clearly err in impliedly finding that the license was not "conditioned" upon payment of royalties on products not covered by the Kaster patent.

### b. The Grant-back Clause

■ The license agreement requires Medical to assign to the University any improvements to the Kaster patent developed by Medical. The inclusion in a patent license of a provision requiring the licensee to assign improvement patents is not per se

illegal. *Transparent-Wrap Machine Corp. v. Stokes & Smith Co.,* 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563 (1947). But if a grant-back provision is applied to substantially extend and enhance the scope of the monopoly in the licensed patent, then such application constitutes patent misuse. *Duplan Corp. v. Deering Milliken, Inc.,* 444 F.Supp. 648, 700 (D.S.C.1977), *mod. on other grounds,* 594 F.2d 979 (4th Cir.1979), *cert. denied,* 444 U.S. 1015, 100 S.Ct. 666, 62 L.Ed.2d 645 (1980).

■ The determination of substantial extension depends on technical comparison of the Huffstutler patent with the Kaster patent. We cannot extrapolate evidence from the special verdict or the record to support an implied finding on this issue. Such a technical comparison is peculiarly within the factfinder's province. We therefore remand this issue to the trial court, directing it to make specific findings and to specifically determine whether Medical met its burden of proving the assignment substantially extended the claims of the Kaster patent.

### c. Payment of Royalties After Expiration of Kaster Patent

■ The trial court ordered Medical to pay royalties "on the valves manufactured and sold by Medical \* \* \* which have the same general configuration as the current [L–K] and Omniscience/Omnicarbon" valves until December 22, 1997, the date the Huffstutler patent expires. This construction appears to require Medical to pay royalties on L–K valves which are sold past the expiration date of the Kaster patent. The use of a royalty agreement that projects beyond the expiration date of all the licensed patents is unlawful *per se. Brulotte v. Thys Co.,* 379 U.S. 29, 32, 85 S.Ct. 176, 179, 13 L.Ed.2d 99 (1964).[4]

---

3. The 1975 negotiations were the only plausible time during which the University could have "conditioned" the license upon payment of royalties on uncovered products. In 1971, which was pre-*Shiley,* it seems clear everyone believed Kaster covered the L–K valve.

4. Since we do not agree that the Huffstutler patent becomes, by assignment, a "licensed patent" under the agreement, *see infra,* we do not address the University's argument that, through the assignment of an unexpired patent, the "package license" rule of *Beckman Instruments, Inc. v. Technical Development Corp.,* 433 F.2d

■ Neither party refers to any testimony in the record which would bear upon a construction of the duration of the license agreement, and the trial court's order does not provide us with either its rationale or the evidence it relied on in construing the duration of the license. The trial court apparently determined the duration of the license based solely upon its reading of the relevant provisions of the license. Because this evidence is documentary, we apply the appellate standard of review on documentary evidence stated in *In Re Trust Known as Great Northern Iron Ore Properties*, 308 Minn. 221, 243 N.W.2d 302 (1976), *cert. denied*, 429 U.S. 1001, 97 S.Ct. 530, 50 L.Ed.2d 612 (1976).

■ Paragraph 2 of the original license agreement provides that the license shall "extend for the life of the last of the *licensed patents* to expire unless earlier terminated in accordance with the provisions hereof" (emphasis added). If the license is to continue in effect until the expiration of the Huffstutler patent, as the trial court determined, then the Huffstutler patent must somehow become a "licensed patent" under paragraph 2 to support the trial court's interpretation.

The license does not define the phrase "licensed patents." However, one of the opening clauses of the license defines "licensed inventions" and provides:

> WHEREAS, MINNESOTA is the owner of the entire right, title and interest in and to certain inventions, herein described and sometimes referred to as the "licensed inventions" relating to heart valves which are subjects of Letters Patent of the United States, Nos. 3,367,364 and 3,476,143 [Kaster] and for Letters Patent of Canada, Serial No. 943,287, and upon which other patent applications have been and may be filed; * * *.

We think it fair to equate the undefined phrase "licensed patents" with the defined phrase "licensed inventions." Paragraph 2 speaks of "licensed patents," and not "licensed inventions," presumably because inventions do not expire but patents do.

Careful analysis of the whereas clause discloses that in order to be a "licensed invention," the "entire right, title and interest to the invention relating to heart valves" had to be *owned* by the University at the time of the original license. This means that only inventions owned by the University in 1971, when the agreement was signed, can be "licensed inventions" under the clause. The Huffstutler patent did not exist in 1971, nor did the devices it describes. There is no explicit language indicating that assigned "improvement inventions" upon being patented were to be considered "licensed patents" under paragraph 2. Therefore, the Huffstutler patent, an improvement invention, is not a licensed patent within the meaning of paragraph 2.

The trial court's improper construction of the license created the patent misuse issue addressed above. We hold that the license agreement terminates upon the expiration of the Kaster patent. Properly construed, this portion of the license agreement does not constitute patent misuse.

**IV**

The University cross-appeals the trial court's denial of prejudgment interest for the period from October 1, 1984, through November 30, 1984, the date the verdict was returned. Royalties calculated by the jury included prejudgment interest at the statutory rate of 6 percent through September 30, 1984, the date upon which the last royalty payment was due before trial.

In denying the University interest from the date upon which the last royalty payment was due until the verdict was rendered, the trial court incorrectly relied upon *Johnson v. Moberg*, 354 N.W.2d 613, 615 (Minn.Ct.App.1984), *pet. for review denied* (Minn. Feb. 19, 1985), for the proposition that prejudgment interest is not recoverable until "final judicial decision on * * * liability * * * occurr[ed]." *Johnson* was a

55, 61 (7th Cir.1970), *cert. denied*, 401 U.S. 976, 91 S.Ct. 1199, 28 L.Ed.2d 326 (1971), applies to the license. *See also Hull v. Brunswick Corp.*, 704 F.2d 1195, 1202 (10th Cir.1983).

personal injury case in which the supreme court ordered a new trial on liability, but left intact the damages award from the first trial in 1981. This court disallowed prejudgment interest on the 1981 verdict because the tortfeasors' liability was not ascertainable. *Id.*

 A recent amendment to Minn.Stat. § 549.09, subd. 1 (1984), allows prejudgment interest in most cases. *See* 1984 Minn.Laws ch. 399, § 1 (effective July 1, 1984). Medical contends the University is not entitled to prejudgment interest because this cause of action was pending before the effective date of the statute. This argument is meritless. Minnesota law has always allowed prejudgment interest on a final judgment when the damages claim is liquidated or, if unliquidated, "where the damages were readily ascertainable by computation or reference to generally recognized standards such as market value and not where the amount of damages depended upon contingencies or upon jury discretion (as in actions for personal injury or injury to reputation)." *Summit Court, Inc. v. Northern States Power Co.,* 354 N.W.2d 13, 16 (Minn.1984) (quoting *Potter v. Hartzell Propeller, Inc.,* 291 Minn. 513, 518, 189 N.W.2d 499, 504 (1971)). Thus, the trial court's award of prejudgment interest for the period up to July 1, 1984 is affirmed.

As to the period from July 1, 1984, to the date the verdict was returned, the University is entitled to interest under § 549.09, subd. 1(c). *See L.P. Medical Specialists, Ltd. v. St. Louis County,* 379 N.W.2d 104, 110 (Minn.App.1985). The trial court's denial of prejudgment interest from October 1, 1984, through November 30, 1984, is reversed.

**V**

The University appeals the trial court's denial of its motion for attorney's fees. Minn. Stat. § 549.21 authorizes an award of attorney's fees where the unsuccessful party acted in bad faith, vexatiously, or for oppressive reasons. *Nelson v. Engen,* 347 N.W.2d 57 (Minn.Ct.App.1984).

A trial court's refusal to award fees will not be reversed absent an abuse of discretion. *See National Recruiters, Inc. v. Toro Co.,* 343 N.W.2d 704 (Minn.Ct.App. 1984). The record supports the trial court's conclusion that Medical's position was not frivolous, interposed for mere purposes of delay or devoid of merit.

**DECISION**

The trial court properly refused to give collateral estoppel effect to a prior adjudication of the scope of the Kaster patent.

The trial court's evidentiary rulings were not erroneous.

The evidence supports a finding that the total sales royalty provision does not amount to patent misuse; however, findings must be made as to whether the assignment of the Huffstutler patent substantially extends the claims of the Kaster patent. The license agreement terminates on the date the Kaster patent expires.

The trial court erred in denying the University prejudgment interest for the period from October 1, 1984, through November 30, 1984.

The trial court's denial of the University's motion for attorney's fees was well within its discretion.

Affirmed in part, reversed in part, and remanded.