**WEISZHAAR FARMS, INC., L.J. Hog Company, Inc., and Leroy Weiszhaar, Plaintiffs and Appellants,**

v.

**Tom TOBIN, Attorney at Law, Defendant and Appellant.**

Nos. 18184, 18241.

Supreme Court of South Dakota.

Argued Jan. 10, 1994.

Decided Sept. 21, 1994.

Rehearing Denied Oct. 21, 1994.

Rick Johnson of Johnson, Eklund, Nicholson, Dougherty & Abourezk Gregory, for plaintiffs and appellants Weiszhaar Farms, L.J. Hog Co., and Leroy Weiszhaar.

James E. McMahon and Michael McKnight of Boyce, Murphy, McDowell & Greenfield Sioux Falls, for defendant and appellant Tom Tobin.

FITZGERALD, Circuit Judge.

Weiszhaar Farms, Inc., L.J. Hog Company, Inc., and Leroy Weiszhaar (collectively Weiszhaar) appeal from an indemnity and legal malpractice action against attorney Tom Tobin of Aberdeen. The matter was tried before the circuit court of Brown County, with the Honorable Patrick J. McKeever presiding. A jury verdict was entered for defendant Tom Tobin (Tobin). Tobin appeals from the trial court's refusal to tax as a disbursement the fee of his expert witness. We affirm in part, reverse in part, and remand.

## STATEMENT OF FACTS

Leroy and JoAnne Weiszhaar operated a farm and livestock operation near Leola, South Dakota through two corporations known as Weiszhaar Farms, Inc., and L.J. Hog Company, Inc. In 1985 Weiszhaar started getting into financial trouble with the Leola State Bank. About the same time, the bank changed ownership and was renamed the Livestock State Bank (Livestock Bank). On June 13, 1986, the new bank management advised Weiszhaar that the bank would no longer finance Weiszhaar's operation in its present condition and gave Weiszhaar ninety days to pay off a loan balance of $613,719.38. Weiszhaar wanted to keep farming and went to Tobin to determine what could be done to keep his operation going. Tobin advised Weiszhaar that he could either pay the debt owed to Livestock Bank or file a Chapter 11 bankruptcy petition for his corporations. Weiszhaar filed a Chapter 11 petition for the two corporations on September 2, 1986 with the understanding that the filing would give him some time to develop a plan to manage his debt and prevent Livestock Bank from immediately foreclosing on his property.

In the spring of 1987, Livestock Bank offered to settle Weiszhaar's entire debt for $500,000.00. At that time Weiszhaar either could not, or did not, desire to avail himself of the offer. However, Weiszhaar agreed to make some payments to Livestock Bank in accordance with a cash collateral agreement which the Bankruptcy Court approved. These payments were not made.

In that same year, Weiszhaar went to Ashley, North Dakota to meet with Mark Schaunaman from the McIntosh County Bank (McIntosh Bank) to negotiate the possibility of the McIntosh Bank taking over the entire loan from the Livestock Bank. These negotiations carried over to 1988, with Weiszhaar reporting back to Tobin that the McIntosh Bank was going to loan him $500,000.00. However, McIntosh Bank's desire to loan Weiszhaar money dried up concomitantly with the weather.

In late April 1988 attorney Tobin and attorney Robert Hayes, who represented Livestock Bank in the bankruptcy proceeding, agreed on an oral stipulation before the Bankruptcy Court which settled the Weiszhaar debt to Livestock Bank for $685,000.00. The resulting Bankruptcy Order provided a payment schedule where $80,000.00 was due May 2, 1988; $105,000.00 was due June 10, 1988 and $500,000.00 was due June 25, 1988. The stipulation also required Weiszhaar to have, by May 27, 1988, a loan commitment for $500,000.00. In the event that the above payments were not made or the loan commitment was not obtained, the stipulation's "drop-dead" clause became effective. It allowed Livestock Bank to immediately liquidate the Weiszhaar property to pay the entire debt due of $819,374.84. If Weiszhaar had made the payments as provided for in the stipulation, Weiszhaar would have saved

approximately $134,000.00 from the actual total debt owed.

The $80,000.00 payment was made from cash on hand, while some yearlings were liquidated to produce the $105,000.00 June 10th payment. Weiszhaar, however, was unable to obtain the loan commitment by May 27th or make the $500,000.00 June 25th payment. At that point in time, Livestock Bank was legally entitled to repossess all of Weiszhaar's collateral and recover the total original loan balance of $819,374.84 minus the previous payments of $185,000.00. Livestock Bank did not immediately take action against Weiszhaar upon default.

At this point, Mark Schaunaman suggested that McIntosh Bank and Livestock Bank in effect split Weiszhaar's indebtedness. Under this plan McIntosh Bank would loan Weiszhaar $320,000.00 secured by personal property (livestock and machinery), $235,000.00 of this to be paid to Livestock Bank in partial repayment of debt. The remaining $85,000.00 would be kept by Weiszhaar to buy replacement livestock for those sold to make the $105,000.00 June payment. Purchase of replacement livestock with the $85,000.00 retained was absolutely necessary in the eyes of McIntosh Bank to provide adequate cash flow for debt service from Weiszhaar's operation. Under this plan, Livestock Bank was to continue to carry a loan in the amount of $265,000.00 secured by Weiszhaar's real estate. The Livestock Bank loan was dependant upon the further condition that Weiszhaar obtain a 90% FmHA guarantee of the loan.[1]

On June 2, 1988, Livestock Bank wrote a letter informing Weiszhaar to assemble the livestock and machinery forthwith so that liquidation could begin due to Weiszhaar's default. However, the negotiations between Weiszhaar, McIntosh Bank and Livestock Bank continued and resulted in another stipulation (second stipulation). Tobin was not involved in the negotiation of this second stipulation. Tobin testified that he was in-formed by Weiszhaar the agreement would not explicitly state that $85,000.00 of the $320,000.00 loaned by McIntosh Bank would be retained by him because it had to look like all the money was going to the banks. Tobin further testified that Weiszhaar informed him if there had been any such provision included in the second stipulation, there would not have been a deal. Boyd D. Hopkins, Jr., President of Livestock Bank, confirmed with his testimony that if the second stipulation read that $85,000.00 was to be retained by Weiszhaar, the bank would not have signed the second stipulation.

Tobin informed Weiszhaar that he was skeptical of Livestock Bank allowing the retention of $85,000.00 from the loan proceeds without explicitly stating it in the second stipulation, and as such, the promise to allow retention of the monies would not be legally enforceable. The second stipulation, drafted by Robert Hayes, Livestock Bank's attorney, was sent to Tobin. Tobin forwarded it to Weiszhaar with a letter requesting that he review the stipulation and call Tobin to further discuss the matter.

Weiszhaar reviewed the second stipulation, signed it, wrote a note concerning the terms of the stipulation and returned it to Tobin. In the note Weiszhaar asked Tobin to see if he could extend the loan period and lengthen the reporting time after sale of livestock. Weiszhaar also informed Tobin that he did not have the funds to pay the additional interest payment of $4,583.00, which was in consideration for the new extension, but that it could be paid out of the $85,000.00 that he was intending to retain from the loan. **Weiszhaar's note said nothing** about the lack of a provision in the second stipulation regarding the retention of $85,000.00 out of the $320,000.00 loan proceeds from McIntosh Bank. Tobin testified that Weiszhaar did not question the absence of the $85,000.00 retention, because Weiszhaar knew all along that it was going to read that way.

---

**1.** Thus, under this new proposal Weiszhaar would be borrowing a total of $585,000.00, of which $500,000.00 was to be paid to Livestock Bank in full satisfaction of a debt that was in excess of $634,000.00. (Weiszhaar's debt on April 26, 1988 was $819,387.84 minus two pay-ments totalling $185,000.00 pursuant to the first stipulation with Livestock Bank, which resulted in a balance of $634,387.84.) Thus, even if Weiszhaar had to pay the full $585,000.00 to Livestock Bank, there would have been savings in excess of $49,000.00.

The deadlines imposed by the second stipulation were not met. Additionally, during the processing of the various loan applications, Livestock Bank explicitly stated that it was going to insist on retaining the entire $320,000.00 loan proceeds and not allow Weiszhaar to retain the $85,000.00 to buy replacement livestock. Of course, McIntosh Bank would not loan Weiszhaar $320,000.00 if he was not allowed to keep $85,000.00 to buy replacement livestock, without which Weiszhaar's operation would be unable to generate the necessary cash flow. Weiszhaar was also unable to meet the 90% FmHA guarantee as required in the stipulation. At best, FmHA would provide a 70 or 75% guarantee, which was unacceptable to Livestock Bank.

By August 29, 1988, Weiszhaar was in default of the second stipulation because he did not have the financing in place. Thus, pursuant to the "drop-dead" clause in the second stipulation, Livestock Bank could have immediately liquidated Weiszhaar's collateral. Tobin, however, was able to convince Livestock Bank to grant Weiszhaar an extension to October 3, 1988, in return for a payment of $5,000.00. On October 3, 1988, Weiszhaar was again in default of the second stipulation because he did not have financing in place. On October 4, 1988, Livestock Bank's counsel notified Weiszhaar by letter that he should assemble his collateral for delivery to Livestock Bank. On October 21, 1988 Livestock Bank repossessed Weiszhaar's collateral.

Tobin met with Weiszhaar on Sunday, October 30, 1988 to determine if there was anything that could be done to stop the sale of the livestock. The next morning they met again and the idea of filing a Chapter 12 bankruptcy petition came up. Tobin testified that he was unable to find any cases that prohibited the filing of a Chapter 12 petition when there was already a Chapter 11 petition pending. Tobin testified that when he decided to file the Chapter 12 he took into consideration Bankruptcy Rule 9011. Tobin testified that Rule 9011 does not prohibit the "filing of novel theories of law or extending existing law or attempting to get a remedy for your client that may be novel, [or that] may not have been done before." Trial Transcript at 539. However, Tobin also testified:

> **I also told him from a practical standpoint, for the court to establish a precedent of being able to file a Chapter 11, then it does—you can't meet the terms, and turn around and file a Chapter 12, is like two bites of the apple, doubles the court's work and doubling all the creditor's work; from a practical standpoint, I don't think Judge Hoyt is going to buy it, I don't think he is going to allow this type of thing.**

*　　*　　*　　*　　*　　*

> Leroy looked at me, he said, if we file, will it stop the sale of my cattle? And I said, I'm sure if we file the papers it will stop the sale of your cattle. [emphasis added].

At the same time Tobin attempted to file a motion to stay the court's order and asked for a hearing on the issue of the amendment to the Chapter 11 petition. When the judge turned down the motion to amend the Chapter 11 petition, the Chapter 12 petition was filed.

The livestock were in the process of being sold when the automatic stay came into effect by the filing of the Chapter 12 Petition on November 1, 1988. On November 2nd, Livestock Bank filed a motion to dismiss the Chapter 12 petition. The petition was dismissed on November 8th after a hearing. A motion was filed to impose sanctions after the Chapter 12 petition was dismissed, while at the same time Livestock Bank was proceeding in state court on a foreclosure action.

A hearing on the sanctions motion was held on March 20, 1989. Bankruptcy Rule 304 requires that a response to the motion for sanctions be filed at least five days prior to the date set for hearing. Tobin did not respond to the motion for sanctions, and in fact, gave the wrong date for the hearing to Weiszhaar, who showed up a day late to court. There was a full briefing by both sides on the sanctions. On October 19, 1989 the Honorable Irvin N. Hoyt, Chief Bankruptcy Judge, issued his decision, concluding:

> The subsequent filing of the Chapter 12 Petition was done in bad faith and was an attempt to frustrate the Court's order for

surrender of personal property and two subsequent denials of motions to stay the implementation of that order.

Hoyt Memorandum Decision at 2.

Consequently, the court ordered that Weiszhaar and Tobin were jointly and severally liable to Livestock Bank for the sanction of $50,777.59 for the costs necessarily incurred in transferring and holding the livestock which could neither be sold nor kept at the Bowdle Sale Barn.[2] The entire sanction judgment was paid from the proceeds received for Weiszhaar's land in the state court foreclosure action upon the entry of summary judgment.

Tobin retained attorney Curt Ewinger to represent him in filing a motion to extend the time for appeal of the sanction judgment. Tobin did not appeal on behalf of Weiszhaar, who, after finding out that the appeal time had run, retained attorney Jean Massa. Eventually, attorney Massa was successful in securing a reversal of the sanction order **against Weiszhaar.** By the time of Judge Porter's reversal of the sanctions against Weiszhaar was received, attorney Hayes had completed the foreclosure on the Weiszhaar land, and Livestock Bank had collected the full sanction amount from the foreclosure proceeds.

Tobin did not contest the actual **amount** of the sanctions because he felt that they were a "legitimate expense in their sale." However, when the judge imposed the sanctions, Tobin informed Weiszhaar **"I felt at that stage of the game ... I needed to have my own attorney. We may have two different positions to argue ... [a]nd so consequently, I told him to go ahead and get his own attorney."** While Tobin initially appealed the ruling, he later dropped the appeal because:

he ruled that the sanction amount, the amount of the award, was compensatory, and he was just trying to pay the bank back for the amount they fed the cattle and what they were charged for trucking.

So consequently, at that stage of the game, since these amounts were going to be recoverable in the foreclosure anyway, it didn't make any sense to pursue the appeal at that stage of the game, because they were going to collect them in the State Court action. **It didn't make any difference to me at that point in time, the fact that—since they are going to be collected anyway, and it is going to be an expense of the Weiszhaars, it was their cattle, their deal, that I had no business appealing anymore, *and the bank agreed that they would satisfy my part of it once the foreclosure was done.*** [emphasis added].

### DECISION

### ISSUE I

WHETHER THE TRIAL COURT ERRED BY NOT ENTERING A DIRECTED VERDICT ON WEISZHAAR'S INDEMNITY CLAIM FOR THE SANCTIONS AWARDED BY THE HONORABLE IRVIN N. HOYT, BANKRUPTCY JUDGE, AND AFFIRMED BY THE U.S. DISTRICT COURT AS TO THEIR ATTORNEY, TOBIN.

The U.S. Bankruptcy Court, Judge Irvin Hoyt presiding, ruled in favor of Livestock

2.

| | | |
|---|---|---|
| Yardage at the Bowdle Sale Barn | | $ 7,200.00 |
| Truck Transportation from Bowdle to Letcher | | 3,500.00 |
| Yardage at the Letcher Feedlot | | |
| 249 cows for 48 days | 4,244.20 | |
| 108 yearlings for 81 days | 13,439.07 | |
| 242 calves for 101 days | 19,564.32 | |
| Vet supplies for calves | 230.00 | |
| | | 37,477.59 |
| Legal fees directly related to filing of the Chapter 12 Petition | | 2,600.00 |
| TOTAL | | $50,777.59 |

Bank in dismissing the Weiszhaar's Chapter 12 petition. The Bankruptcy Court stated:

Bankruptcy Rule 9011 provides, in salient part:

Every petition, pleading, motion or other paper served or filed in a case under the code on behalf of a party represented by an attorney ... shall be signed by at least one attorney of record [.] ... The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief formed after a reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; **and that it is not interposed for any improper purpose, such as to harass, to cause delay, or to increase the cost of litigation. ...** If a document is signed in violation of this rule, the court on motion or on its own initiative, shall impose on the person who signed it, the representative party, or both, **an appropriate sanction which may include** an order to pay the other party or parties the amount of the **reasonable expenses incurred because of the filing of the document, including a reasonable attorney's fees.**

Hoyt Memorandum Decision at 3–4. (emphasis added).

Judge Hoyt noted that the Eighth Circuit has ruled that the purpose of Rule 11 is to **"compensate the offended party** for the expenses caused by a violation as well as **to penalize the offender."** Hoyt Memorandum Decision at 4; *Lupo v. R. Rowland & Co.,* 857 F.2d 482 (8th Cir.1988). Rule 9011 is violated when the party or attorney files a document:

(1) **not well grounded in fact,** warranted by existing law or containing a good faith argument for a change of the existing law, or

(2) for an **improper purpose....**

**The rule is intended to be vigorously applied to curb frivolous pleadings and other papers.**

Hoyt Memorandum Decision at 4. (emphasis added) (citations omitted). The Bankruptcy Court recognized the contention that the subsequent filing was designed to advocate a new or novel theory, but opined that "[a] legal position is unwarranted by law where any reasonably competent attorney would recognize that it is plainly clear that it has absolutely no chance of success." Hoyt Memorandum Decision at 5, (citations omitted).

While debtors may have indeed fell upon **some novel legal theory** (a contention upon which this Court makes no decision), such **does not preclude the imposition of sanctions where the initial and paramount reason for the subsequent filing was to delay the surrender of the livestock to the bank. A document may survive scrutiny under the first prong of Rule 11 but nevertheless be judged to have been filed for an improper purpose.** [citation omitted]. It is clear to the court the debtors filed the second bankruptcy petition to delay the sale of the livestock. The above stated authorities likewise make it clear that such action constitutes an improper, sanctionable purpose under Rule 9011.

\* \* \* \* \* \*

The subsequent filing arguably was also initiated in order to evade the triggering of the "drop dead" clause found in the stipulation previously entered into by Weiszhaars and the bank. This Court, like a host of others throughout the country, recognizes the validity of these clauses in the bankruptcy setting. [citations omitted]. It is axiomatic that if **"drop dead" clauses are to serve any purpose, the court must enforce them according to their terms.** To fail to enforce them would make their creation an idle act. The court believes that agreements with such clauses should not be effectuated if the parties thereto have no intention of honoring them. **Moreover, where such an agreement is effectuated and one party thereto has no intention of honoring it, the parties initial entry into the agreement would appear to have been made in and may constitute evidence of, bad faith.**

Hoyt Memorandum Decision at 5–6.

The Honorable Donald J. Porter, Chief Judge, United States District Court, District

of South Dakota held that the "[d]ebtors were entitled to rely on their attorney with regard to the purely legal issues surrounding multiple filings, **it is, therefore, debtor's counsel who should bear the responsibility for the Bankruptcy Court's sanction.**" Judge Porter Memorandum Opinion, 113 B.R. 1017, 1018 (emphasis added). In Judge Porter's well reasoned decision the salient points mandating the imposition of sanctions by Judge Hoyt were quickly brought to the fore:

> Quite possibly the most significant attribute of filing for bankruptcy and warding off creditors is the automatic stay of 11 USC § 362.
>
> \* \* \* \* \* \*
>
> And while there is no inherent abuse in availing oneself of the automatic stay, manipulating the judicial process by reimposing the automatic stay through multiple filings works and unconscionable fraud on creditors.. *See In Re: Kinney,* 51 B.R. 840, 844–45 (Bankr.C.D.Calif.1985). Thus an abuse of § 362 occurs when the debtor has no intention of effectuating a realistic plan of reorganization **and a bankruptcy court's self-executing injunction results in unnecessary and costly delays.** *Id.* Abuse of the automatic stay provision by attorneys and their clients mandates imposing the heavy handed measures provided in Bankruptcy Rule 9011.
>
> \* \* \* \* \* \*
>
> Debtors and Tobin twice filed motions to stay the execution of the order directing surrender of the livestock. Following the denial of the second motion, Tobin hastily filed a Chapter 12 Petition on that same day.
>
> \* \* \* \* \* \*
>
> Tobin's zeal is laudable, but does not obscure the **intent of the successive filing— to frustrate the bankruptcy court's order** of October 17, 1988 and delay the sale of the livestock by abusive use of the automatic stay.
>
> The bankruptcy court also found compelling the argument that the Chapter 12 filing was an attempt to avoid triggering the valid, judicially enforceable "drop dead" clause contained in the stipulation entered into between the parties. **This finding is uncontroverted by the fact of the filing itself.**
>
> The final argument concerned the failure of the debtors and Tobin to file a responsive brief on the sanctions hearing as required by local Bankruptcy Rule 304. Mr. Weiszhaar was not present at the hearing nor was a responsive brief filed by either debtors or their counsel setting forth a proper factual or legal basis for the Chapter 12 filing. Accordingly, **no evidence was presented at the hearing disputing banks basic contention that the "proceedings were commenced in bad faith for the purpose of delaying and obstructing execution" of the bankruptcy court's order and that no "legally supportable basis for their filing" existed.**
>
> \* \* \* \* \* \*
>
> The above discussion demonstrates that the bankruptcy finding of delay as the impetus behind the successive filing was fully supported by the facts.

Judge Porter Memorandum Decision at 1020–21. (emphasis added), (footnotes omitted).

Judge Porter exonerated the Weiszhaars from the sanctions imposed by Judge Hoyt, making Tobin solely liable:

> The latter portion of Rule 9011(a) squarely addresses whether a violation occurred. "[T]o cause delay" is specifically listed as an improper purpose.[3]

This subjective component of Rule 9011:

> the code after his plan has been confirmed under § 1129. It is also true that § 1107 does not expressly *authorize* a successive filing under another chapter while the Chapter 11 case remains open. Most significantly, though, is the fact that other courts facing this issue have unfailingly and unequivocally held that successive filings under two chapters of the code

---

3. The Bankruptcy Court did not address the novelty of [Tobin's] defense, rather finding that the motivating factor behind the Chapter 12 filing was to delay the sale of the livestock. The Court correctly rested on this "improper purpose" as one sanctionable under Rule 9011.

 It is, of course, true that nothing in § 1107 expressly prevents a Chapter 11 debtor in possession from filing under a different chapter of

necessitates an imposition of sanctions when a paper is interposed for an improper purpose, whether it is supported by the facts and the law, and no matter how careful the pre-filing investigation.

*In re Excello Press, Inc.,* 104 B.R. 924, 927 (Bankr.N.D.Ill.1989).

Porter Memorandum Opinion at 1022.

As far as the status of a particular legal issue is concerned, it is the attorney's "responsibility to stay abreast of any changes in the law during the pendency of th[e] lawsuit. This [is] not the client's responsibility, but the [attorney's] alone." *Excello Press,* 104 B.R. at 928. **Debtors could not have been expected to know of the Bankruptcy Court's Memorandum Opinion in [In re]** *Gerth* **[116 B.R. 170 (Bankr.D.S.D.1989)] which expressly prohibited simultaneous filings under two different chapters of the code. Nor is it reasonable to impose upon a debtor who has retained counsel the task of researching that issue as addressed by other jurisdictions.** In this instance, therefore, the successive Chapter 12 filing was "legally and factually unjustified ... hav[ing] no purpose other than harassment, delay, or increasing the costs of litigation." *In re Sowers,* 97 B.R. 480, 486 (Bankr.N.D.Ind.1989). Furthermore, in carrying out his duty to conduct a reasonable inquiry into the facts which would support the petition, the Court can envision no set of facts of which Tobin was unaware and which debtors misrepresented or failed to disclose.

\* \* \* \* \* \*

Notwithstanding that the petition was filed for the "initial and paramount reason" of frustrating the Bankruptcy Court's order and delaying the sale of the remaining livestock, this delay was accomplished by invoking the protective mechanisms of the Bankruptcy Code. **Tobin, not the debtors, is required to be familiar with the code provisions protecting the rights of both the debtor and creditor. Bankruptcy Rule 9011 requires Tobin to respect and safeguard those provisions, not to unreasonably ignore them.**

\* \* \* \* \* \*

As a result, the petition was interposed as a "predatory instrument" which "recklessly create[d] needless costs" for which Bank was entitled to relief. *Sowers,* 97 B.R. at 484.

Porter Memorandum Opinion at 1023.

Judge Porter left no doubt about the amount nor purpose behind the sanctions:

This Court agrees with the Bankruptcy Court that the $50,777.59 is a reasonable amount in this instance **to deter future abuses of the automatic stay.** This amount is neither excessive nor oppressive inasmuch as Tobin was aware of the forthcoming sale date and the effect of the § 362 on this sale. In addition, based upon the hearing testimony this amount is the actual out-of-pocket cost to the Bank, the innocent party in this case, **and *its payment appropriately rests with the blameworthy party.* This Court recognizes that Rule 9011 sanctions "should be sparingly employed so as not to stifle creativity or vigorous advocacy."** *In re Arena,* 81 B.R. [851] at 856 [(Bankr.E.D.Pa.1988)]. But more important in this case is the maxim **that "[t]he purpose of Rule 11 is to 'compensat[e] the offended party for the expenses caused by a violation as well as penaliz[e] the offender'...."** *Lupo v. R. Rowland and Co.,* 857 F.2d 482 (8th Cir.1988) (citing *Sanctions Under the New Federal Rule 11—A Closer Look,* 104 F.R.D. 181, 201 (1985)). **As no alternative sanction could remedy the injury to Bank as a result of the Chapter 12 filing,** see, *Von Poppenheim v. Portland Boxing & Wrestling Commission,* 442 F.2d 1047 (9th Cir. 1971), *cert. denied,* 404 U.S. 1039, 92 S.Ct. 715, 30 L.Ed.2d 731 (1972), **the amount ordered to be paid as sanctions in this**

frustrate the authority and object of the Bankruptcy Courts when delay isn't an accompanying factor. *See, e.g. In Re: Hill,* 84 B.R. 623 (Bankr.E.D.Mo.1988). As briefly set forth in the Bankruptcy Court's letter opinion, Tobin's

reliance on § 1107 is pretextural, with a microscopic chance of overturning existing law on this issue.

Porter Memorandum Opinion at 1022, n. 5.

**matter is appropriate.... [a]ccordingly, the Bankruptcy Court's order is affirmed regarding the grant of sanctions against attorney Tobin in the amount $50,777.59. The order of the Bankruptcy Court imposing sanctions against appellants is reversed.**

Porter Memorandum Opinion at 1024.

Weiszhaar specifically sought indemnification in the pleadings.[4] The shibboleth of an indemnity action, a judgment against one party and payment by a different, innocent party, are readily apparent here.

 In reviewing the Weiszhaars' contention that the trial court erred in failing to grant a directed verdict, we view the evidence in a light that is most favorable to the non-moving party and give that party the benefit of all reasonable inferences that fairly can be drawn from the evidence. *Denke v. Mamola*, 437 N.W.2d 205, 207 (S.D.1989) (citations omitted). When viewed in this light, if there is any substantial evidence to sustain the cause of action or defense, it must be submitted to the finder of fact. *Id.* (citations omitted). "If sufficient evidence exists so that reasonable minds could differ, a directed verdict is not appropriate." *Sabag v. Continental South Dakota*, 374 N.W.2d 349, 355 (S.D.1985). In this case there was absolutely no evidence to sustain Tobin's defense; thus, the law necessarily dulls the edge of chance.

 The law of indemnity is well settled in this jurisdiction: indemnification arises when a party discharges a liability that equitably should have been discharged by another. *Degen v. Bayman*, 86 S.D. 598, 200 N.W.2d 134 (S.D.1972); *Ebert v. Fort Pierre Moose Lodge #1813*, 312 N.W.2d 119 (S.D. 1981); *Sheehan v. Morris Irr., Inc.*, 460 N.W.2d 413 (S.D.1990), Sabers, Justice (dissenting). Indemnity is a remedial measure that is a separate cause of action, independent of the underlying liability. *Id.* In South Dakota indemnity is an "all-or-noth-

ing" proposition where the party seeking indemnification must show an absence of proportionate fault to shift the entire liability, which was obviously done here. *Sheehan* at 417. Indemnity is proper, indeed mandated, where only one party has a liability or duty, which was discharged by another. *Degen, Ebert, Sheehan, supra.* The trial court was clearly erroneous in submitting the equitable claim of indemnity to the jury. **"[T]he right of indemnity depends upon the principle that everyone is responsible for the consequences of his own wrong, and if others are compelled to pay damages that ought to have been paid by the wrongdoer, they may recover from him."** 41 Am.Jur.2d, Indemnity, § 20. **Tobin's opportunity to contest the amount or propriety of the sanctions was in another forum and another time.** A jury has no jurisdiction to overrule a binding Federal Court judgment against Tobin, and paid by Weiszhaar. Anyone claiming to be aggrieved by a judgment must perfect an appeal to overturn it, or alternatively, pay it. As Justice Henderson pithily stated in a related case, "one who ... has taken a position in judicial proceedings may not later challenge the judgment or take a position inconsistent with his earlier position." *Weiszhaar Farms v. Livestock State Bank*, 467 N.W.2d 752, 755 (S.D.1991). The trial court is hereby reversed and on remand ordered to enter a judgment in favor of Weiszhaars and against Tobin in the amount of the sanctions plus prejudgment interest and costs.

### ISSUE II

Because our decision on Issue I disposes of Tobin's second contention, it will not be specifically addressed here.

### ISSUE III

WHETHER THE TRIAL COURT ERRED IN GIVING PARAGRAPH "B." OF JURY INSTRUCTION NO. 10.

---

4. (20) Prior to the reversal by Judge Porter, the amount of said sanctions was, however, incorporated into the foreclosure on the Plaintiffs' real property, was reduced to judgment against the Plaintiffs and has been paid by Plaintiffs in the mortgage foreclosure proceeding.
 (21) Plaintiffs have sought indemnification from Defendant for said payment which Defendant has refused.

(22) That the Plaintiffs are entitled to such indemnification plus prejudgment interest on all of the losses described in the complaint above as provided by law.

Weiszhaars' Second Amended Complaint at 5.

■ In pertinent part, Instruction No. 10 provided:

In this action, the Plaintiffs have the burden of proving the following elements to sustain his claim alleging negligence in connection with the execution of the July 10, 1988 stipulation:

a. That the defendant was negligent in his representation of plaintiff in the execution of the July 10, 1988 stipulation by not expressly providing therein that $85,000.00 of the loan proceeds would be paid to the Weiszhaars for the purchase of replacement cattle;

b. **That the plaintiff would have successfully refinanced his debt and avoided foreclosure but for the negligence of the defendant.**

c. That his negligent conduct was a proximate cause of damages to the plaintiffs; and

d. The amount of damages ...

[emphasis added].

The plaintiff in a legal malpractice action must prove "the case within the case." Thus, Weiszhaar had to prove that Tobin's claimed negligence in reviewing the stipulation for inclusion of the $85,000.00 retention prevented Weiszhaar from being able to refinance. We specifically noted this in a recent malpractice action, "[o]ur review of the record indicates sufficient evidence upon which a jury could determine that, absent McGladrey's negligence, Lien would not have incurred the additional tax." *Lien v. McGladrey & Pullen,* 509 N.W.2d 421, 425 (S.D. 1993) (emphasis added). There was ample evidence in the record, if believed by the trier of fact, that even if Tobin was negligent, Weiszhaar still would have been unable to refinance. The jury was properly instructed and their verdict will not be overturned.

## ISSUE IV

WHETHER THE TRIAL COURT ERRED IN REFUSING TO TAX AS A DISBURSEMENT THE FEES OF TOBIN'S EXPERT WITNESS IN EXCESS OF THE STATUTORY RATE.

■ We have previously stated that "in the absence of some clear reference to expert witness fees being treated different from statutory witness fees, the reformed legislation [SDCL 15–17–37] falls short of the mark. To hold otherwise would be to allow something other than the plain meaning of the words." *Nelson v. Nelson Cattle Co.,* 513 N.W.2d 900, 907 (S.D.1994). The trial court did not err in taxing the witness fee at the statutory rate versus the fee charged by the expert of $4,939.59.

The case is affirmed, in part, and reversed and remanded in part for entry of a judgment consistent with this opinion.

MILLER, C.J., and HENDERSON, Retired J., concur.

SABERS, and AMUNDSON, JJ., dissent.

KONENKAMP, J., not having been a member of the Court at the time this action was submitted, did not participate.

FITZGERALD, Circuit Judge, for WUEST, J., disqualified.

SABERS, Justice (dissenting).

Even if the majority is correct in their position that the trial court abused its discretion in refusing to admit the transcripts of the prior judgments,* the admission of the

---

* The admissibility of prior civil judgments in subsequent civil cases is questionable. Although "there are numerous situations in which it seems unreasonable and impractical to ignore the evidential use of a judgment in another proceeding involving the same fact as in the present case," 5 Wigmore, Evidence § 1671a (Chadbourn rev. 1974) other authorities state that a jury would be unduly prejudiced by admitting into evidence prior civil judgments when res judicata or collateral estoppel do not apply. 2.C. McCormick, McCormick on Evidence, § 298 (John W. Strong ed.) (4th ed. 1992); *Regents of Univ. of Minn. v.*

*Medical Inc.,* 382 N.W.2d 201, 208–09 (Minn. App.1986) (holding that prior civil judgments are inadmissible because the jury would give undue weight to findings issued by a judge).

Here, the trial court ruled that the bankruptcy decisions would be allowed only on the issue of damages. Otherwise, the transcripts of the decisions were not admitted. We should not disturb the trial court's evidentiary ruling, absent an abuse of discretion. *State v. Grooms,* 399 N.W.2d 358 (S.D.1987). An abuse of discretion was not shown.

transcripts should not result in a directed verdict on liability.

Even if the prior decisions were admitted into evidence, they are only an additional fact for the jury to consider and should not form the basis for a directed verdict by this court. Whether damages, if any, were caused by Attorney Tobin's actions, if any, or by the conduct of plaintiff Weiszhaar himself are proper questions for the jury. It is clearly error on the part of this court to direct a verdict for plaintiff Weiszhaar and I dissent.

"[W]hen faced with a motion for directed verdict, we must accept as true the evidence presented by the nonmoving party and indulge all legitimate inferences in favor of the party against whom the motion is brought." *Savold v. Johnson*, 443 N.W.2d 656, 658–59 (S.D.1989); *Kreager v. Blomstrom Oil Company*, 379 N.W.2d 307 (S.D.1985); *Budahl v. Gordon & David Associates*, 323 N.W.2d 853 (S.D.1982); *Myers v. Quenzer*, 79 S.D. 248, 110 N.W.2d 840 (1961). "We must determine if there is any substantial evidence to sustain the cause of action. If such evidence exists as would allow reasonable minds to differ, the case must go to the jury." *Haggar v. Olfert*, 387 N.W.2d 45, 49 (S.D.1986); *Sabag v. Continental South Dakota*, 374 N.W.2d 349, 354–55 (S.D.1985); *Lytle v. Morgan*, 270 N.W.2d 359, 361 (S.D.1978). Tobin presented evidence that the sanctions award of $50,-777.59 was compensatory and not punitive. He presented evidence that the award was to cover the expenses of the foreclosure sale of the cattle, except for $2,600 in legal fees for the improper filing of the Chapter 12 petition. This should also prevent a directed verdict.

The verdict shows that the jury believed Weiszhaar was responsible for the costs. Weiszhaar requested that the Bank wait to sell the livestock for his own income tax purposes. The Bank did wait to sell most of the cattle until the beginning of the next year, to Weiszhaar's benefit. Tobin present-

ed evidence that most of the costs were for the care of the cattle during this waiting period. Therefore, Tobin presented sufficient evidence which clearly precludes this court from directing a verdict in favor of Weiszhaar on the issue of indemnity on the sanctions award.

The jury's verdict should be affirmed or the case should be remanded for retrial, but *this Court should not* direct the verdict.

AMUNDSON, J., joins this dissent.

---

Additionally, the majority would seem to be arguing that some form of res judicata or collateral estoppel controls this case. The majority opinion states in part:

 A jury has no jurisdiction to overrule a binding Federal Court judgment against Tobin, and paid by Weiszhaar.

The majority misses the point. First, it is·not a matter of jurisdiction. Secondly, the jury's task is clearly to determine the meaning or significance of the prior civil judgments if in fact they are admissible in the first place.