United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 97-1396

_____

Stockmen's Livestock Market, Inc.,     *
        *
        Appellee,     *
        *   Appeal and Cross-Appeal from
    v.        *   the United States District Court
        *   for the District of South Dakota
Norwest Bank of Sioux City, NA,     *
        *
        Appellant.     *

_____

No. 97-1397

_____

Stockmen's Livestock Market, Inc.,     *
        *
        Appellant,     *
        *
    v.        *
        *
Norwest Bank of Sioux City, NA,     *
        *
        Appellee.     *

_____

Submitted:  November 19, 1997
Filed:   February 6, 1998

_____

Before BOWMAN, BRIGHT and MURPHY, Circuit Judges.

_____

BRIGHT, Circuit Judge.

Stockmen's Livestock Market ("Stockmen's") filed this action against Norwest Bank of Sioux City, NA ("Norwest"), alleging that Norwest defrauded and deceived Stockmen's by characterizing Norwest's lending and banking relationships with D&R Feedlots, Inc. ("D&R") as "satisfactory," and by breaching its promise to honor one of D&R's nonsufficient funds ("NSF") checks. Stockmen's also claimed that Norwest converted funds "belonging to" Stockmen's when Norwest placed a hold on D&R's checking account. The jury returned a verdict in favor of Stockmen's in the amount of $620,404.04 in compensatory damages and $75,000 in punitive damages. The district court denied Norwest's motion for judgment as a matter of law.

On appeal from the adverse judgment (No. 97-1396), Norwest argues that the evidence fails to support the jury's verdict and that the court erred in giving certain jury instructions. In its cross-appeal (No. 97-1397), Stockmen's argues that the district court erred in failing to award post-verdict, pre-judgment interest on the punitive damages award. We affirm the jury's verdict, in part, with respect to fraud and deceit and reverse with respect to conversion and promissory estoppel. Furthermore, we affirm the award of punitive damages. On the cross-appeal, we reject Stockmen's' claim for any interest on punitive damages before the district court's entry of judgment.

## I.    BACKGROUND

Gail Sohler operates Stockmen's, a livestock sales barn. Don Foreman operated as a cattle broker doing business as D&R. D&R purchased mainly "fat cattle"--those ready for slaughter--and then re-sold the cattle to slaughterhouses, including Iowa Beef Processors ("Iowa Beef").

D&R had a $2.4 million line of credit at Norwest, which D&R initially obtained to finance cattle buying. By the time the transactions in dispute occurred, D&R had fully extended its line of credit. D&R financed its ongoing business transactions by floating checks. Specifically, D&R purchased livestock by writing a check on the day of purchase (the "fat cattle" sales at Stockmen's were on Wednesdays). Stockmen's would then hold D&R's checks until the following Monday when it deposited checks received from the other feedlots that had also purchased "fat cattle."[1] During that several day period, D&R would resell the livestock to a slaughterhouse and then deposit the slaughterhouse's check in its bank account.

Between 1988 and February of 1994, D&R had issued a number of NSF checks. By October 20, 1992, the problem had escalated to a level that caused Norwest to notify D&R that Norwest would no longer honor any NSF check from D&R. D&R had exhausted its line of credit in September, 1993, prior to the transactions in question in February, 1994. On January 1, 1994, Norwest downgraded D&R's credit rating from a 4 to a 4EW, an early warning classification. Mike Rickert, a Norwest loan officer in the agriculture department, had managed D&R's account since late 1990.

On February 1, 1994, Gail Sohler, the owner of Stockmen's, learned that D&R's checks to at least one other livestock barn had been returned NSF. Sohler directed his office manager, Gary Stevens, to call the Livestock Board of Trade[2] in Kansas City to get an update on D&R. Before Stockmen's obtained a further credit check, Stockmen's sold D&R 476 head of cattle on February 2, 1994, and obtained a check from D&R for the full purchase price, $405,324.52. D&R took immediate possession of the cattle and

---

[1]All of the other feedlots submitted their checks by mail, following the sale. Only D&R submitted its checks on the day of sale.

[2]The Livestock Board of Trade, as a branch of the Livestock Marketing Association, conducts credit checks on customers for members of the Livestock Marketing Association.

sent at least 433 head to Iowa Beef for slaughter. Stockmen's deposited the $405,324.52 check in its local bank on February 7. Tr. (vol. I) at 111, 114.

On February 3, Stevens called the Livestock Board of Trade to inquire about D&R's credit status. Joyce Knorr, a business information officer for the Livestock Board of Trade, testified that after Stevens' inquiry, she called Rickert at Norwest. Knorr further testified that Rickert informed her, according to Knorr's notes of the conversation, that D&R's checking account fluctuates from zero to a high six-figure amount and that Norwest considered the checking account "satisfactory." Tr. (vol. II) at 286-87. With respect to D&R's line of credit, Knorr testified that Rickert informed her that D&R had a "revolving line of credit to a low seven figure, there was [sic] outstanding funds on the account" and the account was "satisfactory." Id. at 287. Knorr testified that she immediately relayed this information to Stockmen's.

Rickert in his trial testimony denied telling Knorr that funds were available on D&R's line of credit. Rickert testified he told Knorr the account was "satisfactory" because he believed the credit was fully secured. During this conversation, Rickert did not indicate that D&R had "maxed out" its line of credit or that D&R had written several NSF checks.

On the same day, February 3, Norwest mailed a notice of security interest, signed by loan officer Rickert, to the slaughterhouses doing business with D&R, which included Iowa Beef. The notice of security interest required the slaughterhouses to make all further checks from D&R's sale of cattle payable jointly to D&R and Norwest.

On February 9, Foreman purchased 251 head of cattle from Stockmen's, paid for them with a check in the amount of $215,079.52 and took delivery. On February 11, Stockmen's received notice from Norwest that D&R did not have sufficient funds to cover the $405,324.52 check. At 11:20 a.m. that day, Stevens (office manager for

Stockmen's) called Rickert at Norwest regarding the $405,324.52 NSF check. Stevens testified that Rickert told him that there had been a cash flow problem and that the check would be good if Stevens resubmitted the check. Rickert testified he told Stevens that D&R previously had cash flow problems and to rerun the check, but denied telling Stevens the check would be good. Rickert and Stevens did not discuss D&R's $215,079.52 check for the February 9 livestock purchase.

Sometime after noon on February 11, Rickert conducted a drive-by inspection of D&R's feedlot, and counted 300 cattle rather than the 1800 counted at the January collateral inspection. At 4:20 p.m. that afternoon, Norwest placed a legal hold on D&R's account. The legal hold allowed Norwest to exert complete control over the account.

On February 12, Rickert and his supervisor, Don Vaudt, met with Foreman. Rickert and Vaudt evaluated the available records in an attempt to determine the status of D&R's finances, and examined D&R's bank statements for the previous six months in an attempt to determine what happened to the 1500 missing head of cattle. Norwest asserts that it first learned at this meeting that livestock barns were waiting six to eight days before presenting D&R's checks. At trial, Foreman testified that Rickert and Norwest had known since sometime in 1993 that the sales barns routinely held D&R's checks.

On February 14, Stockmen's deposited D&R's check for $215,079.52 (for the February 9 livestock purchase), along with the returned $405,324,52 check. Norwest terminated D&R's line of credit on February 17. Norwest returned D&R's checks to Stockmen's in the amounts of $405,324.52 and $215,079.52 marked "account closed."

Stockmen's originally brought suit in South Dakota state court against Norwest. Norwest timely removed the case to federal district court. After five days of trial, a jury found for Stockmen's on each of the four theories of recovery: conversion,

promissory estoppel, common law fraud, and statutory deceit, and awarded Stockmen's $620,404.04 in compensatory damages and $75,000 in punitive damages. The district court denied Norwest's motion for judgment as a matter of law, as well as the motion by Stockmen's for pre-judgment, post-verdict interest on the punitive damages award. Both parties timely appealed.

## II. DISCUSSION

The standard of review of the denial of a motion for judgment as a matter of law is <u>de</u> <u>novo</u>. <u>Lamb Eng'g & Constr. Co. v. Nebraska Pub. Power Dist.</u>, 103 F.3d 1422, 1430 (8th Cir. 1997). In the present case, the district court reviewed Norwest's motion for judgment as a matter of law under South Dakota law, which corresponds with South Dakota's standard for reviewing a motion for directed verdict. Specifically, the district court stated that it reviews motions for judgment as a matter of law by:

> view[ing] the evidence in a light that is most favorable to the non-moving party and giv[ing] that party the benefit of all reasonable inferences that fairly can be drawn from the evidence. When viewed in this light, if there is any substantial evidence to sustain the cause of action or defense, it must be submitted to the finder of fact.

<u>Weiszhaar Farms, Inc. v. Tobin</u>, 522 N.W.2d 484, 492 (S.D. 1994) (internal citations omitted). This court has articulated a similar standard for reviewing a sufficiency of the evidence challenge. That standard requires that a jury verdict be affirmed "unless, viewing the evidence in the light most favorable to the prevailing party, we conclude that a reasonable jury could have not found for that party." <u>Chicago Title Ins. Co v. Resolution Trust Corp.</u>, 53 F.3d 899, 904 (8th Cir. 1995) (citation omitted).

## A.    Conanetemon **Conversion**

To recover on its claim for conversion, Stockmen's had the burden of proving (1) that Stockmen's had an ownership interest or possessory right in the deposits in D&R's account; (2) that Stockmen's' interest in D&R's deposits was superior to Norwest's interests; (3) that Norwest's exercise of dominion or control over D&R's deposits was inconsistent with Stockmen's' possessory rights in the deposits; and (4) that Stockmen's suffered a loss.  We conclude that the judgment on the conversion theory must be reversed because Stockmen's cannot demonstrate that it had an ownership or possessory interest in D&R's account at the time of Norwest's alleged conversion.

In Meyer v. Norwest Bank Iowa, Nat'l Ass'n., 112 F.3d 946, 948 (8th Cir. 1997), this court reviewed a similar conversion claim made by a different livestock sales company, Wagner Livestock Sales Company ("Wagner"), against Norwest relating to D&R's account.  In Meyer, Wagner argued that because it had a property interest in the cattle it sold to D&R, it also had a traceable interest in the proceeds from D&R's resale of the cattle to Iowa Beef, which D&R deposited into its checking account. Id. at 950.  However, we stated that Wagner's "ability to trace the funds into the account before February 11, 1994 is not sufficient to establish an ownership or possessory interest in those proceeds." Id.  Rather, we stated that Wagner must show that it had "an ownership or possessory interest in the account at the time of the alleged conversion." Id. (citation omitted).  To make this determination, because D&R's account contained commingled funds from several different sources, we applied the lowest intermediate balance rule. Id. at 950-51.  "Under the lowest intermediate balance rule, it is assumed the traced proceeds are the last funds withdrawn from a contested account." Id. at 951 (citation omitted).  "Once the traced proceeds are withdrawn, however, they are treated as lost, even though subsequent deposits are made into the account." Id.  In Meyer, this court ultimately concluded that Wagner could not show an ownership or possessory interest in any bank account funds

deposited before February 9 because D&R's account had a negative balance on February 9.  Id.

Applying the lowest intermediate balance rule to the present case, we conclude that Stockmen's cannot show a property interest in D&R's account on February 11, the date Norwest placed a legal hold on D&R's account.  D&R deposited two checks from Iowa Beef (for cattle originally obtained from Stockmen's) on February 2 and February 3.  However, on February 4, D&R's account had a negative balance of $191,298.77.  Furthermore, on February 3, 7, and 9, D&R deposited a total of six checks received from Iowa Beef.[3]  Nevertheless, on February 9, D&R's account had a negative balance of $648,462.33.  In light of D&R's negative account balances following the deposits of Iowa Beef's checks, we conclude that under the lowest intermediate balance rule, Stockmen's cannot show an ownership or possessory interest in D&R's account at the time of the alleged conversion.  Accordingly, we conclude that a jury could not have reasonably determined that Norwest converted funds in which Stockmen's had an ownership or possessory interest.

## B.    **Promissory Estoppel**

Based upon the evidence presented at trial, the district court limited the promissory estoppel claim to the alleged assurances by Rickert on February 11 that the $405,324.52 check would be honored.  Add. at 11.  Within hours after Rickert's alleged assertions, Norwest placed a legal hold on D&R's account.

---

[3]By all accounts, the record of D&R's deposits and withdrawals presents a confusing picture.  The record appears to show many deposits from Iowa Beef during this time period.  However, because Norwest has asserted that only the eight checks mentioned above related to the cattle purchased at Stockmen's and Stockmen's did not challenge that assertion, we assume that only these checks are relevant to the conversion issue.

In its instructions to the jury, the district court explained that to establish promissory estoppel, Stockmen's had the burden of establishing the following elements:

(1) the detriment suffered in reliance must be substantial in an economic sense;

(2) the loss to the promisee must have been foreseeable by the promisor; and

(3) the promisee must have acted reasonably in justifiable reliance on the promise made.

Id. at 11-12 (citation omitted).

Both parties focus primarily on the issue of whether Stockmen's can show detrimental reliance upon Rickert's assertions. Stockmen's contends that Rickert's assurances to Stevens (office manager for Stockmen's) on February 11, relating to the status of D&R's account caused Stockmen's to forebear from immediately presenting the check to Norwest on February 11 and from pursuing some other course of action to secure actual payment for the $405,324.52 NSF check.

We conclude, however, that Stockmen's has failed to identify any available course of action on February 11 that would likely have produced actual payment on the $405,324.52 check before Norwest placed a legal hold on the account later that afternoon. At most, a five-hour time period existed between Rickert's telephone conversation with Stevens and Norwest's decision to place the hold on D&R's account. The record shows that one day earlier, on February 10, Norwest returned several NSF checks including the $405,324.52 NSF check to Stockmen's. Had Norwest honored these NSF checks, D&R's account would have reflected a negative balance of over $600,000. The record further shows that D&R's account balance for February 10 amounted to only $27,846.81, and did not at any time thereafter contain sufficient

funds to cover the $405,324.52 check. Finally, the record shows that no checks were paid out on the checking account after February 10.

Stockmen's argues that it need not show the availability of a legal remedy to establish detrimental reliance. While we agree that detrimental reliance does not necessarily require a showing of an available legal remedy, Stockmen's nevertheless must establish that Norwest's assertions caused Stockmen's to detrimentally alter its position. Therefore, Stockmen's had the burden of showing the existence of some available option at 11:30 a.m. (the time of Rickert and Stevens' telephone conversation) that could have produced payment of the $405,324.52 NSF check, and that the option did not exist five hours later when Norwest placed a legal hold on the account. Accordingly, we conclude that a jury could not have reasonably determined that Stockmen's established detrimental reliance based upon Rickert's February 11 conversation with Stevens.

In addition, even if a reasonable jury could have determined that Stockmen's detrimentally relied upon Rickert's statements, we conclude that Rickert's assertions to Stockmen's on February 11 did not amount to a promise upon which Stockmen's could have reasonably relied. In <u>Garret v. Bankwest, Inc.</u>, 459 N.W.2d 833, 848 (S.D. 1990), sub. app. sub nom., <u>Bankwest, N.A. v. Groseclose</u>, 535 N.W.2d 860 (S.D. 1995), the South Dakota Supreme Court stated, "[w]hen the exact nature of the representations . . . are disputed, the issue of estoppel should be presented to a fact finder." At oral argument, Stockmen's asserted that the exact nature of Rickert's statements to Stevens on February 11 are in dispute. Stockmen's maintains that Rickert told Stevens that "We'll make [the check] good." After reviewing Stevens' trial testimony, however, we determine that no support exists for Stockmen's' position relating to what Rickert stated. Specifically, at trial Stevens repeatedly testified that Rickert merely stated that "there was no problem" with D&R's check and that Rickert believed the check would be "good" if Stockmen's re-deposited the check. Tr. (vol. II) at 339-41.

Accordingly we conclude that despite giving Stockmen's the benefit of all inferences from Stevens' testimony, Rickert's statements to Stevens on February 11 did not amount to a promise. Rather, Rickert's statements constituted nothing more than an equivocal assessment of the likelihood that the check would be honored. See Garrett, 459 N.W.2d at 848-49 (stating that a collection of "vague, uncertain and unsettled" statements does not constitute a promise); United States v. Gerth, 991 F.2d 1428, 1434 (8th Cir. 1993) (providing that "[a] promise is an assurance from one party that performance will be rendered in the future, given in a manner that the other party could rely on it").[4]

## C.    Common Law Fraud and Statutory Deceit

The elements for common law fraud and statutory deceit are essentially identical under South Dakota law. The essential elements of common law fraud under South Dakota are:

> That a representation was made as a statement of fact, which was untrue
> and known to be untrue by the party making it, or else recklessly made;
> that it was made with intent to deceive and for the purpose of inducing the
> other party to act upon it; and that he [or she] did in fact rely on it and
> was induced thereby to act to his [or her] injury or damage.

---

[4]Stockmen's asserts that Norwest failed to argue to the district court that its assertions did not amount to a promise and therefore should not be allowed to present it on appeal. Upon review of the record, however, we conclude that even though Norwest did not specifically challenge the existence of a promise to the district court, that Norwest did make a general argument that Stockmen's promissory estoppel claim was not supported by the evidence. Norwest did not present any new evidence on appeal. Moreover, both parties argued this issue on appeal. Under these circumstances, we will consider Stockmen's argument that its alleged assertions did not amount to a promise. See Digi-Tel Holdings, Inc. v. Proteq Telecomm., 89 F.3d 519, 523 n.6 (8th Cir. 1996); Meyer, 112 F.3d at 950 n.2.

Dahl v. Sittner, 474 N.W.2d 897, 900 (S.D. 1991) (quoting Northwest Realty Co. v. Colling, 147 N.W.2d 675, 683 (S.D. 1967). Section 20-10-1 of South Dakota's Codified Law, which governs actions for deceit, provides: "One who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." S.D. Codified Laws § 20-10-1 (Michie 1995). Acts constituting deceit include, inter alia, "[t]he suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact . . . ." S.D. Codified Laws § 20-10-2(3) (Michie 1995).

In light of the similarities between the fraud and deceit theories, we will discuss both issues together. Under both theories, we must first determine whether sufficient evidence in the record supports the jury's conclusion that Norwest intentionally or recklessly mislead Stockmen's by making a false statement of fact or by suppressing facts that Norwest had the duty to disclose.[5] Joyce Knorr, a representative from the Livestock Board of Trade, testified at trial that on February 3, Rickert told her: (1) that Norwest deemed "satisfactory" D&R's checking account and that the account had funds available; and (2) that D&R had a revolving line of credit to a low seven figure, with outstanding funds, that "rolls daily with extensive usage," which Norwest also deemed "satisfactory."[6]

Norwest argues that Rickert's statements to Knorr concerning the status of D&R's checking account were true. In the past, Norwest explains, D&R's cycles of

---

[5]Unlike Stockmen's' promissory estoppel claim, Stockmen's' fraud and deceit claims are not limited to Rickert's alleged assertions to Stevens on February 11. Rather, these claims include Rickert's alleged statements to the Livestock Board of Trade on February 3.

[6]Knorr testified that she relayed to Stockmen's everything Rickert stated in their conversation. Furthermore, Rickert testified that he expected creditors to rely on the information he provided Knorr.

-12-

low cash flow had either resolved themselves or Norwest had extended additional credit. Therefore, Norwest argues that it did not believe D&R's account showed any sign of default. Norwest denies that Rickert told Knorr that D&R had funds available on its line of credit. Norwest concedes that D&R did not have any credit available and, in fact, had been "maxed out" for months. Nonetheless, Norwest asserts that it considered D&R's line of credit "satisfactory" because D&R's interest payments were current, D&R did not default under the terms of its loan, and Norwest's collateral levels appeared to be more than adequate.

On our review of the record, we determine that sufficient evidence exists for a jury to reasonably conclude that Norwest provided a misleading report of D&R's financial status. According to Knorr's testimony, Rickert stated that D&R had funds available on its line of credit, Tr. (vol. II) at 287, which Norwest concedes D&R did not have. Tr. (vol. I) at 169, (vol. II) at 181-83. Furthermore, with respect to Rickert's characterization of D&R's checking account and line of credit as "satisfactory," the record shows that Rickert signed the notice of security interest on the same day he spoke with Knorr. As previously stated, the notice of security interest required the slaughterhouses, including Iowa Beef, to make all further checks from D&R's cattle sales payable jointly to D&R and Norwest. In fifteen years of doing business with D&R, Norwest had never before sought this type of security interest. This evidence bears on whether or not Rickert falsely or recklessly mislead Knorr. The jury could reasonably conclude that issuing the notice of security interest would be unnecessary if D&R's checking account and line of credit were actually "satisfactory."[7] See

---

[7]Moreover, the jury had before it the strong testimony of Don Scholten, one of Stockmen's experts, who testified that D&R's account should not have been deemed "satisfactory" for the following reasons:

   1)    D&R lacked liquidity and operated exclusively on borrowed funds;
   2)    D&R was uncooperative with Norwest in handling past cash flow

-13-

Weiszhaar Farms, Inc., 522 N.W.2d at 492 (stating that the jury's verdict should receive "all reasonable inferences that fairly can be drawn from the evidence") (citation omitted).

In addition to these false statements, Norwest also failed to disclose information that it had a duty to disclose. At trial, Rickert testified that when individuals call the bank to seek account information, he may decline to provide any information. However, Rickert recognized that when he does answer such inquiries, he has the duty to give them honest and accurate information. Tr. (vol. II) at 227.

Knorr's two primary questions to Rickert were: Is D&R's checking account satisfactory? Does D&R Feedlots have the ability to purchase cattle? Tr. (vol. II) at 225. In response to Knorr's questions, Rickert did not disclose Norwest's January decision to add an "early warning" designation to D&R's risk rating or the fact that D&R had a long record of overdrafts during the past year.[8] We conclude that a jury

---

shortages;
3)      D&R had cash flow shortages every year;
4)      D&R's records were poor;
5)      D&R's financial statements substantially underestimated the accounts payable; and
6)      D&R had a pattern of overdrafts.

See Tr. (vol. III) at 406-407.

[8]Norwest argues that it had no duty to disclose the early warning designation or D&R's history of NSF checks. Norwest explains that the early warning designation "does not really mean much." Norwest further explains that in the past D&R would always satisfy NSF checks.

"What one is bound to disclose is a fact question depending upon the particular circumstances of each case." Moss v. Guttormson, 551 N.W.2d 14, 16 (S.D. 1996).

could have reasonably concluded that the nondisclosure of these facts contributed to a misleading assessment of D&R's ability to purchase cattle, especially in light of the inaccurate statements previously mentioned.[9]

We turn next to the issue of whether sufficient evidence exists to support the jury's determination that Stockmen's relied upon Norwest's misrepresentations and that such reliance caused Stockmen's' injury. First, with respect to the $215,079.52 check D&R used to make its February 9 purchase, Norwest argues that Stockmen's cannot establish detrimental reliance because Gail Sohler, the owner of Stockmen's, conceded that receiving NSF checks from a buyer that were later made good would be no reason to stop doing business with the buyer. Therefore, Norwest argues that if it had disclosed its receipt of overdrafts from D&R, along with its experience that D&R unfailingly made good on such overdrafts, that Stockmen's would have continued doing business with D&R.

Stockmen's maintains that it would have refused to sell more cattle to D&R if Norwest had fully disclosed D&R's financial status on February 3. Gail Sohler, the owner of Stockmen's, testified at trial that he would not have allowed D&R to purchase cattle by check on February 9 if Sohler had known of D&R's financial difficulties. Tr.

_____

We determine that a jury could reasonably determine that Norwest had a duty to disclose this information to provide a complete and honest response to Knorr's question of whether D&R had the ability to buy cattle.

[9]Stockmen's also had the burden of proving that Norwest acted with the intent to deceive. See S.D. Codified Law § 20-10-1 (Michie 1995). In light of all the evidence in this case, especially Norwest's decision to send notices of a security interest to the slaughterhouses on the same day Rickert assured Stockmen's that D&R's account was "satisfactory," a jury could reasonably conclude that Norwest had the intent to deceive Stockmen's. See Commercial Credit Equip. Corp. v. Johnson, 209 N.W.2d 548, 551 (S.D. 1973) ("Questions of fraud and deceit are generally questions of fact and as such are to be determined by the jury.").

(vol. I) at 116-17.[10]  Accordingly, with respect to D&R's February 9 check for $215,079.52 we conclude that sufficient evidence exists to support the jury's finding that Stockmen's detrimentally relied upon Norwest's fraudulent assertions.

Next, we turn to the issue of whether sufficient evidence in the record supports the jury's determination of detrimental reliance relating to the $405,324.52 check.  This issue presents a different question than the $215,079.52 check because Stockmen's sold the cattle to D&R and received the $405,324.52 check in payment before inquiring with Norwest on the status of D&R's bank account.  Thus, to establish detrimental reliance, Stockmen's needed to prove that it could have collected its debt owed by D&R, represented by the NSF check of $405,324.52, if it had received accurate information from Norwest about D&R's financial circumstances.  We have examined the record.  Adequate evidence does not support a conclusion that Stockmen's demonstrated detrimental reliance relating to the $405,324.52 NSF check.[11]

Stockmen's relies upon highly speculative evidence and assertions.  The $405,324.52 check arrived at Norwest on February 9 whereupon Norwest returned the check to Stockmen's because of insufficient funds in the account.  Jt. App. at 91; Tr. (vol. II) at 241-42.  Furthermore, the record does not indicate that Stockmen's could

---

[10]Although Sohler somewhat discredited this testimony during cross-examination, we conclude that a jury could reasonably conclude that Sohler would not have sold cattle to D&R on February 9, if he would have known the full extent of D&R's financial difficulties.

[11]The jury did not specifically find that Stockmen's established detrimental reliance with respect to either of the two checks in question.  However, the fraud and deceit claims are the only claims remaining in this case and the jury's award of compensatory damages equaled the amount of the two checks in question.  We therefore conclude that Stockmen's may only recover the amount represented by the check for which it has established detrimental reliance upon Norwest's fraudulent misrepresentations.

-16-

have obtained payment on the check if Stockmen's would have presented the check directly to Norwest before February 9. The record shows that the ending balance in D&R's account between February 3 and February 9 did not approach $405,324.52. Jt. App. at 91. Only one piece of testimony appears to support Stockmen's' contentions. Specifically, Rickert testified that at one point on February 8, D&R's account had a balance of approximately $520,000. Tr. (vol. III) at 568. We, however, conclude that this argument relies on the assumptions that Stockmen's could have presented the check at that moment in time and that no other checks required payment. The record supports neither of these assumptions. In fact, more than $300,000 in D&R checks arrived at Norwest on February 8. Jt. App. at 90-91. At all other times, the account contained insufficient funds to pay the $405,324.52. Moreover, Norwest did not owe Stockmen's any obligation to honor the presentation of D&R's check by Stockmen's before paying any other check presented at about the same time.

In addition, we do not consider persuasive the assertions by Stockmen's that it could have contacted Iowa Beef to reclaim the cattle or to obtain payment for the cattle. The record shows that D&R delivered most of the cattle to Iowa Beef on February 2, the day before Norwest's misrepresentations. See Tr. (vol. IV) at 748-56; Jt. App. at 322-53. The record also shows that Iowa Beef paid advances on the cattle deliveries. See id. Based on the evidence in the record, we conclude that by February 3, the cattle purchased at Stockmen's and the proceeds from those cattle were beyond any remedial action by Stockmen's.

### D. <u>Jury Instructions</u>

In reviewing a jury instruction, this court must "determine whether the instruction fairly and adequately states the applicable law when reading the instructions as a whole." <u>First Dakota Nat'l Bank v. St. Paul Fire and Marine Ins. Co.</u>, 2 F.3d 801, 813 (8th Cir. 1993) (citation omitted). If a district court errs in giving or not giving an

instruction, that error must be prejudicial before the appellant is entitled to any relief. See Walker v. AT&T Techs., 995 F.2d 846, 849 (8th Cir. 1993).

Norwest argues that the district court erred, as a matter of law, in giving Jury Instruction Nos. 11, 12, 16, 19, 20, 21, 24 and 26. Our ruling with respect to conversion and promissory estoppel, however, moots Norwest's challenges to Instruction Nos. 11, 12, and 24. Furthermore, we reject Norwest's remaining challenges to Instruction Nos. 16, 19, 20, 21, and 26.

With respect to Instruction Nos. 16 and 21, Norwest argues that these instructions separately instructed the jury on claims for common law fraud and statutory deceit, even though both claims are virtually identical. Norwest asserts that it thereby suffered prejudice because Stockmen's essentially had two separate opportunities to prove the same case. We, however, find no authority that provides that giving both a fraud instruction and a deceit instruction in the same case is per se error. Furthermore, in the present case, the jury found in favor of Stockmen's on both claims. These separate findings indicate that the jury considered the evidence and found against Norwest on both fraud and deceit. These findings negate prejudice.

With respect to Instruction Nos. 19 and 20, Norwest argues that these instructions redundantly instructed the jury both on the elements of deceit and on Norwest's obligations with respect to a credit inquiry, creating an impression that Stockmen's asserted separable causes of action of deceit and for an improper response to a credit inquiry. The verdict form given to the jury clearly indicates the theories of recovery, which did not include a claim for an improper response to a credit inquiry. We reject Norwest's argument as unsound.

Finally, with respect to Instruction No. 26, Norwest argues that this instruction improperly instructed the jury with respect to punitive damages, and conveyed the impression to the jury that Norwest was "guilty of oppression, fraud, malice, willful

-18-

and wanton misconduct, or reckless disregard of Stockmen's rights," rather than instructing the jury of the need to separately make such findings.

We first note that Instruction No. 26 reflects a pattern jury instruction taken directly from South Dakota Civil Pattern Jury Instruction No. 35-01. Furthermore, we reject Norwest's contention that this instruction implies a court determination that Norwest has acted improperly. Thus, Norwest cannot show prejudicial error in the jury instructions.

### E.  Punitive Damages

South Dakota law allows punitive damages "[i]n any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed . . . ." S.D. Codified Laws § 21-3-2 (Michie 1987). Establishing fraud and deceit in this case gives rise to punitive damages. Norwest's objection to punitive damages rests wholly on its defense that conversion, fraud and deceit must be dismissed. As we have observed, the fraud and deceit claims stand, and therefore support the award of punitive damages.

We have considered whether the punitive damages award should be reduced in light of our determination that compensatory damages in the sum of $405,324.52 should be set aside. We observe that the award of punitive damages is reasonable compared to actual damages. We may assume that the relatively low award of punitive damages could reflect the jury's award of full compensatory damages claimed by Stockmen's. Should we remand, a jury might increase or decrease the amount of punitive damages. Either result could be justified. Rather than remand, we believe the punitive damage award of $75,000, without interest, should be affirmed as fair and reasonable.

### F.  Post-verdict, pre-judgment interest

In its cross-appeal (No. 97-1397), Stockmen's asserts a right to post-verdict, pre-judgment interest on the punitive damage award. In this case, the jury returned its verdict on June 19, 1995. However, the district court did not enter judgment on the jury verdict for 299 days, until April 23, 1996.

Stockmen's seeks interest on the punitive damages for this period. Stockmen's bases its claim on state law, asserting that the amount of punitive damages became known on June 29, 1995 and that known amounts should bear interest. See S.D. Codified Law § 15-16-3 (Michie 1984) ("When a judgment is for the recovery of money, interest from the time of the verdict or decision until judgment be finally entered must be added to the judgment of the party entitled thereto.").

The district court, however, applied section 21-1-13.1 of the South Dakota Codified Law, which states, "[p]rejudgment interest is not recoverable on . . . punitive damages . . . ." See S.D. Codified Law § 21-1-13.1 (Michie 1987 & Supp. 1997). Stockmen's has shown no error in applying this specific statutory direction to punitive damages. We reject Stockmen's' appeal on this issue.

## III.   CONCLUSION

For the reasons stated in this opinion, we affirm in part and reverse in part the judgment in favor of Stockmen's and remand for the entry of a modified judgment consistent with this opinion. Stockmen's may recover 60% of its costs and

-20-

disbursements attributable to Norwest's appeal. Norwest may recover its costs and disbursements attributable to the cross-appeal.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.